UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**UNITED STATES OF AMERICA**

v.                                                                                                     5:25-CR-00578

**LAURENT LANT**

**O R D E R**

Before the Court is the United States of America's ("the Government") Motion for Review of Magistrate Judge's Bond Decision, Motion for *De Novo* Detention Hearing, and Motion for Stay of Order Setting Bond. *ECF No. 15*. The Court held a hearing on the Motion. Min. Ent. Nov. 6, 2025. The Court considered the evidence submitted by the parties, the testimony of the Government's witness, and the transcript of the initial detention hearing before the Magistrate Judge. *See ECF No. 23*. For the reasons set forth below, the Court GRANTS the Motion.

**PROCEDURAL BACKGROUND**

On September 26, 2025, the Government charged Defendant, via Complaint, with Theft of Government Money or Property, in violation of 18 U.S.C. § 641. *ECF No. 1*. The same day, the Government filed its Motion for Detention Hearing, seeking to detain Defendant because, according to the Government, he is a flight risk. *ECF No. 2; ECF No. 15 at 2*.

1

On October 8, 2025, the Magistrate Judge held the initial detention hearing, and ordered Defendant released with conditions. *Id. at 4*. Thereafter, the Government filed the instant Motion and, on November 6, 2025, the Court held a hearing on the Motion. Min. Ent. Nov. 6, 2025.

## FACTUAL BACKGROUND

Defense Criminal Investigative Service Special Agent Jonathan Reading ("Agent Reading") testified at the November 6, 2025, hearing. Min. Ent. Nov. 6, 2025.

Per Agent Reading, Defendant was the Chief of Banking, Investments, and Insurance for the United States Army's Installation Management Command at Fort Sam Houston in San Antonio, Texas ("IMCOM"). November 6, 2025, Hearing Transcript, at 6:11–21. Defendant assisted in overseeing non-appropriated funds, which were specifically designated to pay for the military's morale, welfare, and recreation operations ("MWR"). *Id*.

IMCOM leadership informed the Army Criminal Investigative Division ("Army CID") and Agent Reading of approximately eighteen suspicious financial transactions that occurred on February 7, 2025. *Id*. at 6:20–7:21. The funds, totaling $510,000, were transferred to Zurich Consulting, LLC. *Id*. According to Agent Reading, the transfers were made by an individual who works under Defendant's authority. *Id*. at 10:12–22. This unnamed individual was given a request to create a payment process, which required Defendant's approval to finalize. *Id*. Agent Reading testified Defendant asked the unnamed person to submit the payment request. *Id*.

Agent Reading then testified about Zurich Consulting, LLC's Certificate of Formation. Gov't Ex. 2. The certificate was filed on February 3, 2025. Defendant is the registered agent, managing member, and owner of Zurich Consulting, LLC. *Id*. The registered agent's business address and the registered office address are the same as Defendant's personal residence.[1]

---

[1] Page two of the Certificate reflects a different address as the "Initial Mailing Address" to be used by the Comptroller of Public Accounts for sending tax-related information. Gov't Ex. 2.

2

November 6, 2025, Hearing Transcript, at 11:13–15. Agent Reading also reviewed Zurich Consulting, LLC's Bank of America Records. *Id*. at 11:16–23.

On February 5, 2025, Defendant signed documents to open this bank account for the company. *Id*. The bank records reflect the account was initially funded with a one-hundred-dollar deposit. *Id*. at 12:2–8. Within two weeks of the initial eighteen suspicious transactions, approximately $509,000 was transferred from Zurich Consulting, LLC's Bank of America account to a joint account held by Defendant and his wife (which is a separate Bank of America account). *Id*. at 12:20–24.

The company name, Zurich Consulting, LLC, is important because Zurich Insurance Group, a separate entity, insured certain facilities located on Fort Gordon in the state of Georgia. *Id*. at 7:25–9:2. These facilities were damaged in a hurricane. *Id*.

The Government highlighted two February 7, 2025, transactions which resulted in funds transferred to Zurich Consulting, LLC for damage to facilities aboard Fort Gordon. Gov't Ex. 18, at 2. The value date column in Gov't Ex. 2 aligns with the actual transfer date of February 7, 2025. *Id*.; *see also* November 6, 2025, Hearing Transcript, at 7:18–21. The highlighted transactions refer to funds purportedly transferred to address damage at the "School Age Center" and the "Woodworth Library" for the insurance claim regarding those structures. Gov't Ex. 18, at 2. Agent Reading stated, in response to a question from the Court, a claim was submitted to Zurich Insurance Group for damage to the School Age Center and the Woodworth Library. November 6, 2025, Hearing Transcript, at 9:10–10:3. The transfers to Zurich Consulting, LLC had nothing to do with Zurich Insurance Group, and there was no legitimate reason for funds to be transferred to Zurich Consulting, LLC. November 6, 2025, Hearing Transcript, at 8:7–9:8.

Ultimately, IMCOM officials placed Defendant on administrative leave, and retained his work computer, work cell phone, and common access card. *Id*. at 19:18–25.

Per Agent Reading, he was concerned that Defendant would attempt to flee and asked for Defendant to be flagged if he tried to leave the country. *Id*. at 20:15–18. Agent Reading learned that Defendant made plans to travel to Benin[2], Africa, which is Defendant's country of origin. *Id*. at 20:22–21:8. Defendant was scheduled to leave the United States on September 25, 2025, the day after he was placed on administrative leave. *Id*. at 21:12–22:2.

After receiving information from Homeland Security Investigations, Agent Reading contacted Defendant at his personal residence. *Id*. at 22:6–22-20. Agent Reading asked Defendant twice whether he had travel plans, and Defendant responded he did not. *Id*. Agent Reading also questioned Defendant's wife regarding his potential plans, and she was evasive, but ultimately confirmed Defendant made plans to leave the country. *Id*. at 22:21–23:8.

Once placed on administrative leave, Agent Reading reviewed Defendant's transactions, and discovered $153,000 was transferred from the Zurich Consulting, LLC account at Woodforest National Bank to a Bank of America account controlled by Defendant. *Id*. at 23:9–21. Defendant also withdrew $8,500 on September 24, 2025, and made a separate $20,000 withdrawal on September 25, 2025. *Id*. at 25:5–10.

Defendant purchased his ticket to Benin on September 24, 2025, the same day he was placed on administrative leave. October 8, 2025, Hearing transcript Before the Magistrate Judge, at 12:14–13:2; 19:20–3. Agent Reading also identified an approximately $31,000 transfer to Eco Bank in Benin. November 6, 2025, Hearing Transcript, at 31:19–25. The name on the account was Laurent Lantonkpode, which is Defendant's birthname. *Id*.

---

[2] Defendant purchased a round-trip ticket and travel insurance for the trip. Defendant was scheduled to return in October 2025. November 6, 2025, Hearing Transcript, at 56:6-13.

The Government now seeks an order from this Court revoking the Magistrate Judge's Order releasing Defendant with conditions pending trial.

## LEGAL STANDARD

### I. Review and Appeal of a Release or Detention Order

Under 18 U.S.C. § 3145(a)(1), the Government may file with the district court a motion to revoke a magistrate judge's order releasing a defendant pending trial. The district court reviews a motion to revoke a detention order *de novo* and "must make an independent determination of the proper pretrial detention or conditions for release." *United States v. Rueben*, 974 F.2d 580, 585 (5th Cir. 1992). The district court has discretion to "support what the magistrate has actually ordered with additional findings based on its independent consideration of the record before the magistrate and the additional evidence adduced before it." *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985).

### II. The Bail Reform Act

The Bail Reform Act, 18 U.S.C. § 3142, governs the release and detention of defendants awaiting trial. A judge may order a defendant detained pending trial based on a finding that the Government has established by a preponderance of the evidence that "no condition or combination of conditions will reasonably assure the appearance of the person," or by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e)(1), (2); *see also Rueben*, 974 F.2d at 586 ("For pretrial detention to be imposed on a defendant, the lack of reasonable assurance of either the defendant's appearance, or the safety of others or the community, is sufficient; both are not required.").

Section 3142(g) of the act requires a court to consider the following factors in determining whether a person poses a flight risk or a danger to the community:

> (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's history and characteristics, including, among other things, his family ties, length of residence in the community, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g); *see also United States v. Acosta-Leyva*, 751 F.App'x 594, 595 (5th Cir. 2019) (per curiam).

## ANALYSIS

### I. Flight Risk

Regarding *de novo* review of flight risk, "the district court, making an independent determination, can order pretrial detention even though the magistrate has refused to do so." *Fortna*, 769 F.2d at 249. "Furthermore, neither the Bail Reform Act nor [Fifth Circuit] caselaw requires a court to be absolutely certain that no possible non-detention option will prevent flight before determining that a defendant must remain in custody." *United States v. Stanford*, 341 F. App'x 979, 981–82 (5th Cir. 2009). As explained above, the standard for determining flight risk is the preponderance of the evidence standard. *Fortna*, 769 F.2d at 250.

### A. Nature and Circumstances of the Offense Charged; Weight of the Evidence; and History and Characteristics

According to the Indictment, Defendant faces two counts of Theft of Government Money or Property, *see* 18 U.S.C. § 641, one count of Money Laundering, *see* 18 U.S.C. § 1956(a)(1)(B)(i), and one count of Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity, *see* 18 U.S.C. § 1957(a). *ECF Nos. 17, 18*. The details of Defendant's alleged conduct establish a sophisticated scheme to transfer government funds to

numerous accounts which Defendant controlled. The Court, however, understands Defendant enjoys the benefit of the presumption of innocence and therefore, it views the strength of the evidence against him for the specific purpose of determining whether he is a flight risk. *See* 18 U.S.C. § 3142(j).

As discussed, Defendant initially conducted eighteen financial transactions and transferred approximately $510,000 to the company he created. Within two weeks of these transactions, Defendant transferred approximately $509,000 to bank accounts he controlled. On September 24, 2025, Defendant was placed on administrative leave, and subsequently conducted an additional series of financial transactions to place funds in accounts he controlled. Most importantly, Defendant made travel arrangements to Benin, Africa, his country of origin.

After receiving information from Homeland Security Investigations, Agent Reading met with Defendant at his home. Agent Reading asked Defendant about his travel plans, and Defendant denied any upcoming travel. Defendant's wife initially denied her husband made travel plans, but when pressed, she admitted he made plans to fly to Benin. Defendant was actively attempting to flee from any further investigation or potential prosecution when he was arrested. In fact, his arrest is the only reason he did not flee the country.

The evidence presented by the government regarding the alleged unlawful transactions and Defendant's attempt to flee the country is very strong. Defendant faces a statutory maximum punishment of fifty years for these offenses.

Defendant is married and is a father, and he has dual American and Beninese citizenship. He worked for IMCOM at Fort Sam Houston in San Antonio, Texas. He was the chief of banking, investments, and insurance. He owns a home in Cibolo, Texas. The Court therefore understands Defendant has ties to this community and this country, but he also has strong ties to

Benin. Notably, Defendant made plans to fly to Benin without his family. He transferred funds to a Beninese bank account which was under his control. Although Defendant purchased a round-trip ticket the day he was placed on administrative leave, Defendant's conduct leading up to his planned departure indicates he was fleeing the United States without any assurances he would actually return.

Based on the parties' briefs and the evidence presented at the *de novo* hearing, the Court finds these facts support a finding that Defendant is a flight risk, and no condition or combination of conditions will reasonably assure his appearance at trial.

## CONCLUSION

Therefore, the Court **ORDERS** that the Government's Motion for Review of Magistrate Judge's Bond Decision, Motion for *De Novo* Detention Hearing, and Motion for Stay of Order Setting Bond is **GRANTED**. *ECF No. 15*.

The Court further **ORDERS** that the United States Magistrate Judge's Order releasing Defendant is hereby **REVOKED**.

It is so ORDERED.
SIGNED this 8th day of December, 2025.

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE